**BRODSKY SMITH**
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9465 Wilshire Boulevard, Suite 300
Beverly Hills, CA 90212
Phone: (877) 534-2590
Facsimile: (310) 247-0160

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WEI ZHENG,<br><br>                    Plaintiff,<br><br>        vs.<br><br>BIG 5 SPORTING GOODS CORPORATION, STEVEN G. MILLER, VAN B. HONEYCUTT, COLLEEN B. BROWN, STEPHEN E. CARLEY, LILY W. CHANG, JENNIFER H. DUNBAR, and DAVID R. JESSICK,<br><br>                    Defendants. | **Case No.:**<br><br>**Complaint For:**<br><br>(1) Violation of § 14(a) of the Securities Exchange Act of 1934<br>(2) Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Wei Zheng ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

**SUMMARY OF THE ACTION**

1. Plaintiff brings this stockholder action against Big 5 Sporting Goods Corporation ("Big 5" or the "Company") and the Company's Board of Directors (the "Board" or the "Individual Defendants," collectively with the Company, the "Defendants"), for violations of Sections 14(a)

- 1 -
COMPLAINT

1. and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") as a result of Defendants' efforts to sell the Company to Worldwide Golf and Capitol Hill Group ("Worldwide") as a result of an unfair process, and to enjoin an upcoming stockholder vote on a proposed all cash transaction (the "Proposed Transaction").

2. The terms of the Proposed Transaction were memorialized in a June 30, 2025, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, Worldwide will acquire Big 5 for $1.45 in cash per share of Big 5 common stock.

3. Thereafter, on July 24, 2025, the Company filed a Preliminary Proxy Statement on Form PREM14A with the SEC in support of the Proposed Transaction (the "Proxy Statement").

4. The Proposed Transaction is unfair for a number of reasons. Significantly, it appears as though the Board has entered into the Proposed Transaction to procure for themselves and senior management of the Company significant and immediate benefits. For example, certain Company executives are entitled to severance packages, often referred to as "golden parachute" packages, entitling same to millions of dollars not shared by Plaintiff and other Company common stockholders.

5. The Proxy Statement is materially deficient, deprives Plaintiff of the information necessary to make an intelligent, informed, and rational decision of whether to vote in favor of the Proposed Transaction and is thus in violation of the Exchange Act. As detailed below, the Proxy Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for Big 5, provided by Big 5 management to the Company Board, and the Board's financial advisor, Moelis & Company LLC ("Moelis"); and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness opinion created by Moelis if any, and provided to the Company.

6. Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff.

# PARTIES

7. Plaintiff is a citizen of Minnesota, and at all times relevant hereto, has been a Big 5 stockholder.

8. Defendant Big 5 operates as a sporting goods retailer in the western United States. Its products include athletic shoes, apparel, and accessories. The Company is incorporated in Delaware and has its principal place of business at 2525 East El Segundo Boulevard, El Segundo, CA 90245. Shares of Big 5 common stock are traded on the NASDAQ Capital Markets ("NASDAQ") under the symbol "BGFV."

9. Defendant Steven G. Miller ("Miller") has been chairman of the Company Board at all relevant times. In addition, Defendant Miller serves as the Company's President and Chief Executive Officer.

10. Defendant Van B. Honeycutt ("Honeycutt") has been a director of the Company at all relevant times.

11. Defendant Colleen B. Brown ("Brown") has been a director of the Company at all relevant times.

12. Defendant Stephen E. Carley ("Carley") has been a director of the Company at all relevant times.

13. Defendant Lily W. Chang ("Chang") has been a director of the Company at all relevant times.

14. Defendant Jennifer H. Dunbar ("Dunbar") has been a director of the Company at all relevant times.

15. Defendant David R. Jessick ("Jessick") has been a director of the Company at all relevant times.

16. Defendants identified in ¶¶ 9 - 15 are collectively referred to as the "Individual Defendants."

17. Non-Party Worldwide Golf is a nationwide retailer of golf equipment, apparel, shoes and accessories.

18. Non-Party Capitol Hill Group is private investment firm with diversified holdings, including retail.

**JURISDICTION AND VENUE**

19. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have. The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

20. Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company maintains its headquarters in this District.

**SUBSTANTIVE ALLEGATIONS**

*Company Background*

22. Big 5 operates as a sporting goods retailer in the western United States. Its products include athletic shoes, apparel, and accessories. The company also offers a selection of outdoor and athletic equipment for team sports, fitness, camping, hunting, fishing, tennis, golf, and winter and summer recreation, as well as home recreation. In addition, it provides brand name merchandise; and private label items, such as shoes, apparel, camping equipment, fishing supplies, and snow sport equipment.

*The Flawed Sales Process*

23. As detailed in the Proxy Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed with only one concern in mind – to effectuate a sale of the Company.

24. The Proxy Statement is silent as to the nature of the confidentiality agreement entered into between the Company and Worldwide, whether this agreement differed from any other agreement with potentially interested third parties not specifically mentioned by the Proxy Statement, if so in all specific manners, including all specific terms of any such included "don't-ask, don't-waive" provisions or standstill provisions contained therein, including, all specific conditions, if any, under which such provisions would fall away.

25. Further, the Proxy Statement fails to adequately disclose any and all of the communications regarding post-transaction employment during the negotiation of the underlying transaction which must be disclosed to stockholders.

26. It is not surprising, given this background to the overall sales process, that it was conducted in an inappropriate and misleading manner.

*The Proposed Transaction*

27. On June 30, 2025, Big 5 and Worldwide issued a joint press release announcing the Proposed Transaction. The press release stated, in relevant part:

> EL SEGUNDO, Calif. & BETHESDA, Md., June 30, 2025 (GLOBE NEWSWIRE) — Big 5 Sporting Goods Corporation (Nasdaq: BGFV) (the "Company" or "Big 5"), a leading sporting goods retailer, today announced it has entered into a definitive merger agreement (the "Agreement") to be acquired by a partnership comprised of Worldwide Golf and Capitol Hill Group, in an all-cash transaction valued at approximately $112.7 million in enterprise value, including the assumption of approximately $71.4 million in credit line borrowing as of June 29, 2025.
>
> Pursuant to the Agreement, subject to the terms and satisfaction of the conditions thereof, Big 5 stockholders will receive $1.45 per share in cash. This represents a premium of approximately 36% to the company's 60-day volume weighted average price.

"This transaction marks an exciting new chapter for Big 5 that allows the Company to carry on its legacy of serving customers with quality sporting goods at an exceptional value while maximizing value for our stockholders," said Steven G. Miller, Chairman, President and Chief Executive Officer of Big 5 Sporting Goods Corporation. "I want to thank our dedicated employees, loyal customers and valued vendors who continue to support Big 5 in each of the communities we serve."

Worldwide Golf is a leading nationwide retailer of golf equipment, apparel, shoes and accessories. Capitol Hill Group is a Bethesda, Maryland-based private investment firm with diversified holdings, including retail. This acquisition combines Capitol Hill Group's financial resources with Worldwide Golf's specialty retail expertise to provide Big 5 with the long-term capital and strategic support to re-energize growth and further build on its competitive position in the sporting goods retail sector across its western United States footprint. Big 5 will remain an independent company within the Capitol Hill Group portfolio and leverage the combined resources of the partnership.

"We are thrilled to support the next stage of the company's evolution," said Theodore Shin, Chief Executive Officer of Capitol Hill Group. "Big 5 has built an impressive foundation as a leading bricks and mortar sporting goods retailer. We also admire the deep history and culture of the company, and look forward to carrying that forward into the future."

The transaction, which has been unanimously approved by Big 5's Board of Directors ("Board"), is subject to certain closing conditions, including the approval of Big 5's stockholders, and is expected to close in the second half of 2025, subject to the satisfaction of those conditions. After careful consideration of the transaction, Big 5's Board believes this all-cash transaction creates immediate and certain stockholder value. Upon completion of the transaction, Big 5's common stock will no longer be listed on the Nasdaq Stock Exchange, and Big 5 will become a private company.

*Potential Conflicts of Interest*

28. The breakdown of the benefits of the deal indicates that Big 5 insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of Big 5.

29. Additionally, Company insiders currently own large illiquid amounts of Company Shares, Company Options, and Company RSUs, some of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction, not shared amongst Plaintiff

and other public stockholders of the Company as follows:

| Name of Beneficial Owner | Beneficial Ownership Number | Percentage |
|---|---|---|
| **5% or Greater Stockholders** [None] | | |
| **Name of Beneficial Owner** | | |
| **Named Executive Officers and Directors** | | |
| Steven G. Miller | 941,002 (1) | 4.1% |
| Colleen B. Brown | 65,951 (2) | * |
| Stephen E. Carley | 64,951 (3) | * |
| Lily W. Chang | 52,837 (4) | * |
| Jennifer H. Dunbar | 84,344 (5) | * |
| Van B. Honeycutt | 65,201 | * |
| David R. Jessick | 47,951 | * |
| Barry D. Emerson | 66,468 (6) | * |
| Boyd O. Clark | 66,468 (7) | * |
| All directors and executive officers as a group (13 Persons) | 1,625,708 (8) | 7.1% |

| | Vested Company Options (#) | Value of Vested Company Options ($)(1) | Unvested Company Options (#) | Value of Unvested Company Options ($)(1) | Company RSUs (#) | Value of Company RSUs ($)(1) | Company Restricted Shares (#) | Value of Company Restricted Shares ($)(1)(2) |
|---|---|---|---|---|---|---|---|---|
| **Current or Former Non-Employee Directors** | | | | | | | | |
| Colleen B. Brown | 0 | $ — | 0 | $ — | 0 | $ — | 15,000 | $ 21,750 |
| Stephen E. Carley | 0 | $ — | 0 | $ — | 0 | $ — | 15,000 | $ 21,750 |
| Lily W. Chang | 0 | $ — | 0 | $ — | 0 | $ — | 15,000 | $ 21,750 |
| Jennifer H. Dunbar | 0 | $ — | 0 | $ — | 50,550 | $ 73,298 | 15,000 | $ 21,750 |
| Van B. Honeycutt | 0 | $ — | 0 | $ — | 0 | $ — | 15,000 | $ 21,750 |
| David R. Jessick | 0 | $ — | 0 | $ — | 151,842 | $ 220,171 | 15,000 | $ 21,750 |
| **Current or Former Executive Officers** | | | | | | | | |
| Steven G. Miller | 5,416 | $ 1,462 | 59,584 | $ 16,088 | 0 | $ — | 54,000 | $ 78,300 |
| Boyd O. Clark | 0 | $ — | 20,800 | $ 5,616 | 0 | $ — | 24,500 | $ 35,525 |
| Barry D. Emerson | 0 | $ — | 20,800 | $ 5,616 | 0 | $ — | 24,500 | $ 35,525 |

| Name | | | | | | | |
|---|---|---|---|---|---|---|---|
| Jeffrey L. Fraley | 0 | $ — | 18,200 | $ 4,914 | 0 | $ — | 19,600 | $ 28,420 |
| Ian R. Landgreen | 0 | $ — | 20,800 | $ 5,616 | 0 | $ — | 23,100 | $ 33,495 |
| Frank Pasillas | 0 | $ — | 15,600 | $ 4,212 | 0 | $ — | 14,900 | $ 21,605 |
| Shane O. Starr | 0 | $ — | 15,600 | $ 4,212 | 0 | $ — | 19,600 | $ 28,420 |

30.  Moreover, certain employment agreements with certain Big 5 executives entitle such executives to severance packages, should their employment be terminated under certain circumstances. These 'golden parachute' packages are significant, and will grant several directors or officers entitled to them millions of dollars, compensation not shared by Plaintiff and will be paid out as follows:

**Golden Parachute Compensation**

| Name | Cash ($)(1) | Equity ($)(2) | Perquisites/ Benefits ($)(3) | Total ($) |
|---|---|---|---|---|
| Steven G. Miller | $4,462,340 | N/A | N/A | $4,462,340 |
| Barry D. Emerson | $1,627,207 | $48,591 | 41,401 | $1,732,877 |
| Boyd O. Clark | $1,641,675 | $48,591 | 57,079 | $1,731,667 |

31.  The Proxy Statement fails to adequately all communications regarding post-transaction employment during the negotiation of the underlying transaction. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for Plaintiff to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

32.  Thus, while the Proposed Transaction is not in the best interests of Big 5, Plaintiff, or Company stockholders, it will produce lucrative benefits for the Company's officers and directors.

*The Materially Misleading and/or Incomplete Proxy Statement*

33. The Big 5 Board caused to be filed with the SEC a materially misleading and incomplete Proxy Statement that, in violation the Exchange Act, fails to provide Plaintiff in his capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

34. The Proxy Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction. In particular, the Proxy Statement fails to disclose:

    a. Whether the confidentiality agreements entered into by the Company with Worldwide differed from any other unnamed confidentiality agreement entered into between the Company and an interested third parties;

    b. All specific conditions under which any standstill provision contained in any confidentiality agreement entered into between the Company and potentially interested third parties throughout the sales process, including Boeing, would fall away; and

    c. Any and all of the communications regarding post-transaction employment during the negotiation of the underlying transaction which must be disclosed to stockholders.

*Omissions and/or Material Misrepresentations Concerning Big 5 Financial Projections*

35. The Proxy Statement fails to provide material information concerning financial projections for Big 5 provided by Big 5 management to the Company Board and Moelis and relied upon by Moelis in its analyses. The Proxy Statement discloses management-prepared financial projections for the Company which are materially misleading.

36. Notably, the Proxy Statement reveals that as part of its analyses, Moelis reviewed: "certain internal information relating to the business, earnings, cash flow, assets, liabilities and prospects of the Company furnished to Moelis by the Company, including financial forecasts provided to or discussed with Moelis by the management of the Company."

37. The Proxy Statement should have, but fails to provide, certain information in the projections that Big 5 management provided to the Company Board and Moelis. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

38. With regard to the *Unaudited Prospective Financial Information*, the Proxy Statement fails to disclose:

    a. Net Sales, including the inputs, metrics, and assumptions used to determine same;

    b. Adjusted EBITDA, including the inputs, metrics, and assumptions used to determine same; and

    c. Unlevered Free Cash Flow, including the inputs, metrics, and assumptions used to determine same.

39. The Proxy Statement also fails to disclose a reconciliation of all non-GAAP to GAAP metrics utilized in the projections.

40. This information is necessary to provide Plaintiff, in his capacity as a Company stockholder, with a complete and accurate picture of the sales process and its fairness. Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

41. Without accurate projection data presented in the Proxy Statement, Plaintiff is unable to properly evaluate the Company's true worth, the accuracy of the Moelis' financial analyses, or make an informed decision whether to vote his shares in favor of the Proposed

Transaction. As such, the Board has violated the Exchange Act by failing to include such information in the Proxy Statement.

### Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Moelis

42. In the Proxy Statement, Moelis describes its fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

43. With respect to the *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose:

    a. The inputs, metrics, and assumptions used to determine the discount rates of 17.00% to 21.00% utilized;

    b. The inputs, metrics, and assumptions used to determine the UFCF multiples range of 4.0x to 6.0x utilized; and

    c. The Company's weighted average cost of capital utilized.

44. These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

45. Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes his value and serves his interest as a stockholder. Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in his best interests as a public Big 5 stockholder. As such, the Board has violated the Exchange Act by failing to include such information in the Proxy Statement.

# FIRST COUNT

## Violations of Section 14(a) of the Exchange Act

### (Against All Defendants)

46. Plaintiff repeats all previous allegations as if set forth in full herein.

47. Defendants have disseminated the Proxy Statement with the intention of soliciting stockholders, including Plaintiff, to vote in favor of the Proposed Transaction.

48. Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction. Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

49. As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

50. The Proxy Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that

the Proxy Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

51. The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

52. The Individual Defendants were at least negligent in filing a Proxy Statement that was materially misleading and/or omitted material facts necessary to make the Proxy Statement not misleading.

53. The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to decide whether to vote his shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## SECOND COUNT

### Violations of Section 20(a) of the Exchange Act

### (Against all Individual Defendants)

54. Plaintiff repeats all previous allegations as if set forth in full herein.

55. The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or should have known that the Proxy Statement was materially misleading to Plaintiff in his capacity as a Company stockholder.

56. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Proxy Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual

Defendants were able to, and did, control the contents of the Proxy Statement. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Proxy Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

57. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Big 5's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from Plaintiff and Company, and that the Proxy Statement was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Proxy Statement and are therefore responsible and liable for the misrepresentations contained herein.

58. The Individual Defendants acted as controlling persons of Big 5 within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Big 5 to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Big 5 and all of its employees. As alleged above, Big 5 is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and against the Defendants, as follows:

    A.     Enjoining the Proposed Transaction;

    B.     In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

    C.     Directing the Individual Defendants to exercise their fiduciary duties to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein

not misleading;

D.    Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.    Granting such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: July 30, 2025                    **BRODSKY SMITH**

By: *Evan J. Smith*
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9465 Wilshire Blvd., Ste. 300
Phone: (877) 534-2590
Facsimile (310) 247-0160

*Attorneys for Plaintiff*